IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DARCELL COLEMAN, | : |
| | : |
| Petitioner, | : |
| | : |
| v. | : Civil Action No. 22-207-JLH |
| | : |
| BRIAN EMIG, Warden, and ATTORNEY GENERAL OF THE STATE OF DELAWARE, | : |
| | : |
| Respondents.[1] | : |

Jason Javie, Esquire.  Pro Hac Vice Attorney for Petitioner.

Andrew J. Vella, Deputy Attorney General of the Delaware Department of Justice, Wilmington, Delaware.  Attorney for Respondents.

**MEMORANDUM OPINION**

October 9, 2025
Wilmington, Delaware

---

[1] The Court has substituted Warden Brian Emig for former Warden Robert May, an original party to the case.  *See* Fed. R. Civ. P. 25(d).

Hall, District Judge:

Petitioner Darcell Coleman filed a *pro se* petition for a writ of habeas corpus under 28 U.S.C. § 2254. (D.I. 1.) He subsequently retained counsel to represent him, who filed an amended petition and memorandum in support (together, the "Petition"). (D.I. 15; D.I. 16.) The State filed an Answer. (D.I. 18.) On January 9, 2024, the case was reassigned to me. For the reasons below, the Court will deny the Petition.

I.  BACKGROUND

Petitioner is serving a life sentence for murder. The salient facts of Petitioner's underlying conviction were recounted by the Delaware Supreme Court as follows:

> As part of a planned visitation, [the victim's son] J.R. spent May 12, 2013 with his father, Marvin Moore, at Moore's residence at Riverside in Wilmington. Moore was expected to return J.R. to his mother that evening. In the hours leading up to the time Moore was to do so, he and [Petitioner], who was then the boyfriend of J.R.'s mother, exchanged numerous phone calls. Finally, they arranged for Moore to drop J.R. off at a Wawa near Memorial Drive in New Castle. Moore drove toward the Wawa with J.R. and two of Moore's friends, Tierra Battles and Dearius Riley, stopping first at the home of another friend near the Wawa. As they approached the friend's home, Moore could be heard on the phone angrily telling a male voice on the other end that he was not going to let him pick up his son. After they arrived at the friend's home, they decided that Battles and Riley would take J.R. over to the Wawa while Moore remained at the friend's house.
>
> When Battles and Riley arrived at the Wawa with J.R., [Petitioner] was there. Battles asked [Petitioner] where J.R.'s mother was, and [Petitioner] asked Battles where Moore was. They then began arguing. J.R. got in [Petitioner's] vehicle, and [Petitioner] followed Battles back to her vehicle to continue arguing. At one point, [Petitioner] said: "Tell Marvin next time Marvin say something crazy out his mouth I be at his front door." Riley asked if [Petitioner] wanted him to go get Moore, and [Petitioner] replied: "No. If Marvin

was a man, Marvin would have come down." [Petitioner] then departed the Wawa with J.R. while Battles and Riley returned to the friend's house.

When told about the confrontation, Moore responded: "I'm sorry, but I got to go take care of my business, and he was going to go meet [Petitioner] to fight." Moore, Battles, and Riley then drove back to Riverside, during which time Moore and [Petitioner] were "snapping over the phone" in a "heated" conversation. Finally, Moore and [Petitioner] arranged to meet near Peralta's Market in Riverside, which was about a block and a half away from Moore's residence. When [Petitioner] arrived, he backed his vehicle down a one-way street and parked near Peralta's Market. While traveling back to Riverside, Riley overheard Moore say on the phone: "You already at the corner store, so I'll be there in a little bit."

After Moore, Battles, and Riley arrived back at Moore's house, Moore walked to the sidewalk across the street from Peralta's Market. [Petitioner] then got out of his vehicle and ran diagonally back across the street between two cars. Moore was then shot. [Petitioner] ran back to his car and took off. When police arrived at the scene, they determined that Moore had one gunshot wound to the jaw and another one to his chest. He also had an unfired revolver between his thighs.

Michelle Pflaumer, from the Children's Advocacy Center, interviewed J.R. on May 13, 2013. J.R. discussed the previous day's activities during his visitation with his father. He discussed being driven to a gas station by Battles and Riley and being picked up by [Petitioner]. Initially, J.R. told Pflaumer that [Petitioner] took him to his mother's home to sleep, but J.R. eventually said that [Petitioner] took him to the vicinity of his father's home in Riverside. He said that while seated in [Petitioner's] vehicle, he saw [Petitioner] shoot his father.

The Wilmington Police were unable to locate [Petitioner] in Delaware. As a result, they enlisted the help of the U.S. Marshals Service, which apprehended [Petitioner] in Newark, New Jersey on May 31, 2013.

2

*Coleman v. State,* 141 A.3d 1037 (Table), 2016 WL 3387192, at *1–2 (Del. June 3, 2016) (cleaned up).

In October 2013, a Delaware Superior Court grand jury indicted Petitioner on one count of first degree murder, one count of possession of a deadly weapon during the commission of a felony ("PDWDCF"), and one count of possession of a firearm by a person prohibited ("PFBPP"). (D.I. 19-1 at Entry No. 3.) Prior to trial, the Superior Court granted Petitioner's motion to sever the PFBPP charge from the other charges. (D.I. 19-1 at Entry Nos. 16, 31.) In 2014, a Delaware Superior Court jury convicted Petitioner of first degree murder and PFDCF, (D.I. 19-1 at Entry No. 63), and the State entered a *nolle prosequi* for the severed PFBPP charge (D.I. 19-2 at Entry No. 9). On February 20, 2015, the Superior Court sentenced Petitioner to life in prison on the murder charge and three years on the PDWDCF charge, to run consecutively. (D.I. 19-3 at 18.) Petitioner filed a direct appeal, and the Delaware Supreme Court affirmed. *See Coleman*, 2016 WL 3387192, at *1–3.

On July 5, 2016, Petitioner filed a *pro se* motion for postconviction relief under Delaware Superior Court Criminal Rule 61 ("Rule 61 motion"). (D.I. 19-14 at 34–38.) A Superior Court Commissioner appointed counsel, who filed an amended Rule 61 motion on July 25, 2017. (D.I. 19-1 at Entry Nos. 97, 108; D.I. 19-14 at 52–79.) On January 31, 2020, a Superior Court Commissioner issued a Report and Recommendation on Petitioner's motion, which recommended that Petitioner's amended Rule 61 motion be denied. (D.I. 19-1 at Entry Nos. 119, 122, 138.) *See State v. Coleman*, No. 1305011774A, 2019 WL 1780795, at *8 (Del. Super. Ct. Apr. 23, 2019). Petitioner objected to the Commissioner's Report. (D.I. 19-1 at Entry. No. 139.) On February 12, 2021, the Superior Court adopted the Commissioner's Report and Recommendation and denied Petitioner's amended Rule 61 motion. (D.I. 19-1 at Entry No. 144.) *State v. Coleman*, No.

3

1305011774A, 2021 WL 529427, at *10 (Del. Super. Ct. Feb. 12, 2021).  Petitioner appealed.  On December 14, 2021, the Delaware Supreme Court affirmed "on the basis of [the Superior Court's] February 12, 2021 Memorandum Opinion." (D.I. 19-1 at Entry No. 149.) *Coleman v. State*, 268 A.3d 784 (Table), 2021 WL 5903316, at *1 (Del. Dec. 14, 2021).

## II.   LEGAL STANDARDS

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  When a state's highest court has already adjudicated a habeas claim on the merits,[2] the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d).  Under § 2254(d), federal habeas relief may be granted only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or the state court's decision was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1),(2); *see Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001).

A state court decision is "contrary to . . . clearly established Federal law" only "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  *Williams*, 529 U.S. at 413.  An "unreasonable application" of clearly established federal law occurs when a state court "identifies the correct governing legal principle

---

[2] A claim has been "adjudicated on the merits" for purposes of § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or other ground.  *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009).

4

from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.; see also White v. Woodall*, 572 U.S. 415, 426 (2014).

## III.  DISCUSSION

The Petition asserts the following two claims: (1) trial counsel provided ineffective assistance by failing to "elicit evidence that the decedent's firearm misfired insofar as the evidence was available and helpful to [Petitioner's] defense" (D.I. 15 at 5); and (2) trial counsel provided ineffective assistance by "failing to seek a [Delaware Rule of Evidence] 609 ruling in advance of trial and/or [Petitioner's] election against testifying" (D.I. 15 at 7).  Petitioner presented both arguments to the Delaware Superior Court in his amended Rule 61 motion.  The Superior Court denied both claims, and the Delaware Supreme Court affirmed "on the basis of [the Superior Court's] February 12, 2021" decision.  *See Coleman*, 2021 WL 5903316, at *1.  Under these circumstances, Petitioner will only be entitled to federal habeas relief if the Superior Court's decision was either contrary to, or an unreasonable application of, clearly established federal law. *See Wilson v. Sellers*, 584 U.S. 122, 128 (2018).

The "clearly established federal law" governing ineffective assistance of counsel claims is the two-pronged standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny.  *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003); *Lewis v. Johnson*, 359 F.3d 646, 656 (3d Cir. 2004).  Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance.  *Strickland*, 466 U.S. at 688.  Although not insurmountable, this standard is highly demanding and leads to a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  Under the second *Strickland* prong, a petitioner must demonstrate "there

5

is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* A court can choose to address the prejudice prong before the deficient performance prong, and can also reject an ineffective assistance of counsel claim on the ground that the defendant did not satisfy one of the prongs of the *Strickland* standard. *Id.* at 698.

In this case, the Superior Court's decision is not contrary to clearly established federal law because it correctly identified *Strickland* as the standard that applies to Petitioner's claims. *See Coleman*, 2021 WL 529427, at *4.

As for whether the Superior Court reasonably applied the *Strickland* standard to the facts of Petitioner's case and made a reasonable determination based on the evidence before it, federal habeas relief is precluded "so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal marks omitted).

### A. Claim One: "trial counsel was ineffective in the manner in which he handled the firing pin evidence"

In Claim One, Petitioner asserts that trial counsel provided ineffective assistance because counsel failed to further develop and present "firing pin" evidence suggesting that the gun in the victim's possession at the time of the shooting had—at some point in its existence—misfired three times. Petitioner suggests that presentation of such evidence at trial would have furthered a defense theory that Petitioner shot the victim in self-defense because the victim tried to shoot Petitioner. (D.I. 16 at 13.)

In Petitioner's Rule 61 proceeding, the Superior Court "presume[d] without finding" that trial counsel performed deficiently by "not further challeng[ing the State's ballistics expert] to establish that the firing pin evidence was available to support a self-defense claim." *See Coleman*,

6

2021 WL 529427, at *8. The Superior Court nevertheless concluded that Petitioner could not establish the requisite prejudice under *Strickland*. For one thing, the firing pin evidence wasn't that strong, as no evidence suggested that the victim's gun misfired on the same day he was shot. As the Superior Court explained, "even if Trial Counsel had made better use of the firing pin evidence, it remained limited as it lacked any reference to when the revolver may have misfired" and Petitioner's ballistics expert at the Rule 61 hearing "could not opine as to when or why the weapon" had misfired. *Id.* at *9.

The Superior Court's lengthy and reasoned opinion also put into context why further development of the firing pin evidence would not have given rise to a reasonable probability of a different verdict based on self-defense. At the time of the trial, Petitioner was adamant—even to his own trial counsel—that he did not shoot the victim, despite counsel explaining to him that the evidence did not support an "identity" defense and that "[t]he most viable defense . . . is that you acted in self-defense." *Id.* at *4–5. Despite his counsel's advice, "[a]t no point did [Petitioner] ever tell trial counsel that [the victim] had a gun or pointed it at him." *Coleman*, 2019 WL 1780795, at *6. Even at his sentencing, Petitioner told the court that he was "not the person who committed this heinous crime" and that he wanted to prove he was "not the person who did this." (D.I. 19-14 at 20.) It wasn't until the Rule 61 hearing that Petitioner admitted "for the first time" that "he pulled out his own gun and shot [the victim]." *Coleman*, 2021 WL 529427, at *3. Under these circumstances, the Superior Court reasonably concluded that Petitioner's lie to his attorney about not being the shooter "hamstrung" his trial counsel's ability to persuasively argue self-

7

defense to the jury, and that further development of the firing pin evidence was not reasonably likely to lead to a different verdict. *Id.* at *8.[3]

In sum, fairminded jurists could agree with the Superior Court's conclusion that Petitioner failed to demonstrate a reasonable probability that the outcome of his trial would have been different but for trial counsel's failure to further develop the firing pin evidence. Accordingly, the Court will deny Claim One.

### B. Claim Two: "trial counsel was ineffective in failing to seek a D.R.E. 609 ruling in advance of [Petitioner's] election against testifying"

In Claim Two, Petitioner contends that trial counsel provided ineffective assistance by failing to file a motion under Delaware Rule of Evidence 609 for an advance ruling on the admissibility of his 2004 drug dealing conviction. (D.I. 16 at 9.) Petitioner asserts that "the driving force behind his decision not to testify was the prospect of his prior criminal history coming into evidence." (D.I. 16 at 8.)

The Superior Court determined that, even if trial counsel should have requested an in limine ruling, Petitioner "suffered no prejudice by Trial Counsel's failure" to do so. *Coleman*, 2021 WL 529427, at *10. The Superior Court explained:

> Nothing in the record indicates [Petitioner] was concerned about his prior conviction before this postconviction appeal. Finally, it is also notable that [Petitioner] did not make his final decision on whether he would testify until after he had seen the evidence that the State had put forth in its case-in-chief. And at sentencing, he told the Court (and Moore's family) that he hoped the true shooter would one day be found. The Court finds it highly unlikely that even if [Petitioner's] prior conviction had been ruled inadmissible prior to trial, that [Petitioner] would have experienced a change of heart or mind and suddenly admitted to Trial Counsel that he shot Moore.

*Coleman*, 2021 WL 529427, at *10.

---

[3] As the Superior Court pointed out, trial counsel nevertheless sought and received a self-defense instruction.

8

This Court defers to the Superior Court's determination that Petitioner's assertion of choosing not to testify due to concerns about his prior conviction was not credible. What's more, Petitioner does not assert that he would have testified if the trial court had ruled in his favor on a Rule 609 motion, nor does he explain how his testimony would have changed the result of the trial. And, the Superior Court explained, there was no guarantee that Petitioner's conviction would have been excluded even if trial counsel had moved to exclude it under D.R.E. 609.

> So even if the deficiency had been cured and Trial Counsel had filed a Rule 609 motion to exclude [Petitioner's] conviction, [Petitioner] assumes 1) the Court would have ruled in his favor *and* 2) that [Petitioner] would then have elected to take the stand *and* 3) that he would have testified unequivocally to shooting [the victim]. And even assuming twelve jurors would have accepted his testimony as truth to yield a different outcome, these assumptions require supposition and speculation.

*Coleman*, 2021 WL 529427, at *9.

In sum, the Superior Court did not unreasonably apply *Strickland* in concluding Petitioner "suffered no prejudice" from trial counsel's failure to file a D.R.E. 609 motion to exclude Petitioner's prior drug conviction. *Id.* at *10. The Court will deny Claim Two.

## IV.   CERTIFICATE OF APPEALABILITY

A district court issuing a final order denying a § 2254 petition must also decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011); 28 U.S.C. § 2253(c)(2). A certificate of appealability is appropriate when a petitioner makes a "substantial showing of the denial of a constitutional right" by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

As the Court has concluded, the Petition does not warrant relief. In the Court's view, reasonable jurists would not find this conclusion to be debatable. Accordingly, the Court will not

9

issue a certificate of appealability.

## V. CONCLUSION

For the reasons discussed, the Court will deny the Petition without holding an evidentiary hearing or issuing a certificate of appealability.  An appropriate Order will be entered.